Argued and submitted February 28, reversed May 10, 2006

In the Matter of the Adoption of
Skylar Yvette Moore-Tillay,
nka Skylar Ann Fast, a Minor Child.

Denis Marvin FAST
and Lisa Ann Fast,
*Appellants,*

*v.*

Kathleen Denise MOORE,
aka Kathleen Moore-Tillay,
*Respondent.*

01-009CF; A129490

135 P3d 387

John Chally argued the cause for appellants. With him on the brief was Bouneff & Chally.

No appearance for respondent.

Before Haselton, Presiding Judge, and Edmonds and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

This case involves the enforceability of a Post Adoption Communication Agreement (PACA) that appellants entered into with respondent, the birth mother of their adopted child, S, prior to the adoption. The trial court determined that the agreement was not enforceable as written because it was too vague, but also determined that the PACA could be modified and enforced as modified. The trial court therefore entered a judgment modifying the original agreement, from which appellants appeal. They argue that the agreement was never enforceable because it was not "approved by the court" at any time during the adoption proceeding as required by ORS 109.305(2). Alternatively, they argue that the trial court lacked authority to modify the agreement and, therefore, it is enforceable only as originally written. We agree with appellants that neither the original nor the modified PACA is enforceable because neither was "approved by the court" within the meaning of ORS 109.305(2). Therefore, we reverse.

We review the facts *de novo*. ORS 19.415(3).[1] Respondent was incarcerated in 1998, when S was seven years old. S was then placed in foster care with appellants. In 2000, with respondent still incarcerated, the Department of Human Services (DHS) petitioned to terminate respondent's parental rights and approached appellants about adopting S. DHS encouraged appellants and respondent to agree to an "open" adoption—that is, an adoption that allows for an ongoing relationship among the birth family, adoptive family, and adoptee. To that end, respondent and appellants entered into a mediation process that resulted in the original PACA that is now at issue.

The PACA gives appellants broad discretion in allowing communication between respondent and S. For example, it provides for all meetings to be "scheduled in a

---

[1] The 2005 Legislative Assembly amended ORS 19.415. Or Laws 2005, ch 568, § 27. The amendments are not relevant to our analysis; accordingly, we cite the current version of the statute.

manner which meets the best interests of the child, as determined by the adoptive parents." It also provides that appellants may cancel visitation if they feel that "visitation is getting out of control." In addition, a paragraph entitled "invalidation" provides that, if respondent "assumes an adversarial rather than cooperative relationship with adoptive parents (except in regard to enforcement of this agreement), the adoptive parents will no longer have to honor this agreement."

After signing the PACA, respondent agreed to a stipulated judgment terminating her parental rights on the ground of unfitness. Thereafter, appellants adopted S. There is no indication that the PACA was discussed or made a part of the record in either of those proceedings. In addition, the parties agree that the PACA as originally written was not approved by a court.

After respondent's release from prison, the parties began having disputes over visitation. Appellants felt that respondent had assumed an adversarial role and therefore informed her that they no longer were obliged to honor the PACA. Respondent then sought to enforce the PACA in the trial court pursuant to ORS 109.305(4).[2] Additionally, she sought to modify the PACA to eliminate some of appellants' discretion regarding visitation. Appellants responded that the agreement was not enforceable because it had never been approved by a court as required by ORS 109.305(2). The trial court appears to have agreed that the PACA had not been approved by a court[3] and further concluded that the agreement was not enforceable as written because it was too vague. Nonetheless, the trial court determined that respondent had relied on the PACA in stipulating to the termination

---

[2] ORS 109.305(4) provides, in part, "An agreement made under subsection (2) of this section may be enforced by a civil action."

[3] The court did, however, make the following finding: "Although not part of any written record, the court finds that the written Agreement was approved by the court in the [adoption] proceeding and became effective, according to its terms, when [S] was placed for adoption * * *." The basis for that finding is not clear, especially in light of the court's later statement that "there is little doubt that under ORS 109.305(2) the court never approved the written agreement." Because there is no evidence that the PACA was approved by the adoption court and, indeed, respondent has never contended that it was, we find, on *de novo* review, that the PACA was not approved by the court as part of the adoption proceedings.

of her parental rights, and equity demanded that the court modify the agreement so as to render it enforceable. Accordingly, it entered a judgment modifying the PACA and ordering the parties to adhere to it.

■    On appeal, appellants argue that neither the original nor the modified PACA is enforceable because neither was approved by the adoption court at the time of the adoption. In appellants' view, ORS 109.305(2) prohibits PACAs that have not been "approved by the court" in an adoption proceeding and contains no exception for agreements that were not so approved but were relied on by one of the parties. Respondent has not appeared on appeal to offer a different interpretation of the statute. Nonetheless, we have an independent obligation to arrive at the correct construction, regardless of the parties' arguments. *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997); *State v. Walker*, 192 Or App 535, 542, 86 P3d 690, *rev den*, 337 Or 327 (2004). The correct construction of the statute presents a question of statutory interpretation that we analyze according to the framework laid out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). To determine the legislature's intent, we look to the text of the statute in context and, if necessary, to legislative history and other interpretive aids. *Id.* at 610-12. The context of the statute includes preexisting common law and the statutory framework within which the law was enacted. *See Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 415, 908 P2d 300 (1995) (examining "historical context" of a statute at the first level of analysis).

■    Prior to the enactment of ORS 109.305(2), PACAs were not enforceable as contrary to public policy. *Whetmore v. Fratello*, 197 Or 396, 397, 252 P2d 1083 (1953). ORS 109.305(2), enacted in 1993, however, announced a new public policy regarding certain PACAs. It provides:

> "Nothing in the adoption laws of this state shall be construed to prevent the adoptive parents, the birth parents and the child from entering into a written agreement, approved by the court, to permit continuing contact between the birth relatives and the child or the adoptive parents. As used in this subsection, 'birth relatives' includes birth parents, grandparents, siblings and other members of the child's birth family."

Examining the text in context, we note that the initial phrase in subsection (2)—that "nothing in the adoption laws of this state shall be construed to prevent" certain PACAs—suggests an awareness on the part of the legislature that "the adoption laws of this state" have previously been construed, in *Whetmore,* to prohibit such agreements. Thus, that portion of the text supports appellants' assertion that the legislature intended to preserve the general rule that PACAs are not enforceable and to carve out only a limited exception to that rule.

Other portions of the text can be read to support that construction as well. For example, ORS 109.305(2) states that the adoption laws should not be construed to prohibit PACAs that are "approved by *the* court" (emphasis added), as opposed to "a" court. Because the statute is part of the adoption laws of the state, "the" court most likely refers to *the adoption* court. Thus, the wording of that phrase also supports appellants' argument that the PACA must be approved by the adoption court. Moreover, the next portion of the statute supports appellants' contention that the PACA must be approved by the adoption court *at the time of the adoption.* It provides that the PACA "permit[s] *continuing* contact between the birth relatives and the child or the adoptive parents." (Emphasis added.) The word "continuing" suggests that the agreement will be made prior to the adoption and will allow contact to continue that would otherwise cease at that time.

Subsection (3) of the statute also supports that construction. As noted above, it provides, "Failure to comply with the terms of an agreement made under subsection (2) of this section is not grounds for setting aside an adoption judgment or revocation of a written consent to an adoption." The statute appears to envision a sequence in which the parties first enter into a PACA and then proceed with the adoption, which cannot be set aside even if the PACA is breached. Thus, there is significant textual and contextual support for appellants' construction.

However, there is also textual support for other constructions of the statute that are consistent with the trial court's disposition in this case. For example, one plausible

interpretation of the statute would allow the trial court to approve a PACA at any time, even after the adoption took place. Arguably, that is what the trial court did in this case when it modified the PACA. The text of the statute requires that a PACA be "approved by the court," but it does not specify the nature of court approval that is required, nor does it specify when that approval should take place. In addition, the statute contains no express limitation on when the parties must enter into a PACA. The lack of any express limitation on when the parties must enter into a PACA or on the timing or nature of the court approval supports the interpretation that the requisite court approval may occur at any time.

The next portion of ORS 109.305(2) also can be read to support the view that the trial court approval may occur at any time. It provides that adoption laws shall not be construed to prohibit "the adoptive parents, the birth parents *and the child*" (emphasis added) from entering into certain PACAs. The fact that the statute contemplates that the child will enter into an agreement arguably suggests that those agreements may be entered into whenever the child reaches an age at which his or her participation in the agreement would be appropriate. On the other hand, the statute may, instead, contemplate that the child will be made a party at the time of the adoption, no matter what age, through an appropriate representative. For example, when a child is within the custody of the Department of Human Services (DHS), the child's caseworker must review the PACA to determine whether it meets "the safety needs of the child" and must sign the final PACA.[4] OAR 413-120-0635(10)(a), (b). Accordingly, the inclusion of the child as a party to the PACA does not necessarily lend support to the view that court approval may take place at any time. Still, that interpretation is at least plausible.

Another plausible interpretation is that the legislature intended to overrule *Whetmore*. The initial phrase in

---

[4] The PACA in this case was not signed by the child but was signed by a DHS employee, who was likely the child's caseworker. The parties do not raise any issue regarding whether the child was a "party" to the PACA as ORS 109.305(2) seems to require.

ORS 109.305(2)—that "[n]othing in the adoption laws of this state shall be construed to prevent" certain PACAs—could be read to eliminate the categorical rule in *Whetmore* that all PACAs are contrary to public policy. It is entirely possible that the legislature intended ORS 109.305(2) to announce a new public policy regarding open adoptions, under which PACAs that are approved by the court should be enforced and PACAs not approved by the court may—or may not—be enforced depending on the policy considerations in the individual case. Thus, the trial court here may have properly taken account of the equities in this case to justify enforcing the PACA.

In sum, we conclude that there are three plausible interpretations of the statute: (1) the legislature intended to preserve the general rule from *Whetmore* that PACAs are not enforceable and to carve out a limited exception to that rule for PACAs that are in writing and have been approved by the adoption court at the time of the adoption; (2) the legislature intended to carve out an exception for PACAs that are approved by the court, but court approval may occur at any time; and (3) the legislature intended to eliminate the rule in *Whetmore* entirely and intended to leave enforcement of previously unapproved PACAs up to the court in individual cases. Because we have identified three plausible interpretations, the statute is ambiguous, and we turn to legislative history to resolve the ambiguity. *See Owens v. MVD*, 319 Or 259, 268, 875 P2d 463 (1994) (resort to legislative history is necessary unless alternative interpretations are "wholly implausible").

The legislative history of ORS 109.305(2) reveals that the legislature intended to continue to prohibit PACAs, except those approved by a court as part of adoption proceedings. ORS 109.305(2) was enacted in 1993 as part of Senate Bill 201, sponsored by the Juvenile Rights Project. A representative of the Juvenile Rights Project, attorney Timothy Travis, gave extensive written and oral testimony before the House and Senate Judiciary Committees and the House Subcommittee on Civil Law and Judicial Administration.

Travis made it clear that ORS 109.305(2) was intended to carve out an exception to *Whetmore*. He

explained, "Under current law any agreement that is made between a birth family and an adoptive family in this regard is totally unenforceable. Those who enter into these agreements are totally at the mercy of the good will of those with whom they agree." House Judiciary Committee, Subcommittee on Civil Law and Judicial Administration, SB 201, June 8, 1993, Exhibit B (written testimony of Timothy Travis).

He also explained that PACAs that are not "approved by the court" would continue to be unenforceable in the future, and described when and how that approval must take place. He stated:

> "Let me emphasize that, if this bill is passed, it will not reach any adoptions which have already been finalized. It will still be possible in the future to have unenforceable open adoptions because this bill lays out the procedure that you have to go through in order to have an enforceable [open] adoption. The agreement has to be in writing, stipulation attached to the decree of adoption, etc."[5]

Tape Recording, House Judiciary Committee, Subcommittee on Civil Law and Judicial Administration, SB 201, June 8, 1993, Tape 132, Side A.

In his testimony, Travis emphasized that, under his understanding of the proposed law, an agreement that is entered into after the adoption is not enforceable because the adoption court must approve the agreement and attach it to the adoption judgment. Absent such court approval, the agreement is unenforceable under the general rule of unenforceability announced in *Whetmore* and retained by ORS 109.305(2). There is nothing in the legislative history to contradict that understanding of ORS 109.305(2). Because Travis represented the organization that drafted the bill and because his explanation of the bill's purpose and effect was uncontradicted, it is reasonable to assume that the legislators who heard and read his testimony relied on it and adopted his understanding of the bill.

---

[5] The bill of which Travis spoke is materially indistinguishable from ORS 109.305(2). Thus, when he spoke of the bill setting out the procedure necessary for an enforceable PACA, he was almost certainly speaking of his understanding of the phrase "approved by the court."

We therefore conclude that ORS 109.305 renders unenforceable PACAs, like the one at issue here, that were not approved by a court as part of the adoption proceedings. That is true regardless of whether the parties relied on the PACA.[6] It follows that neither the original nor the modified PACA was enforceable. The trial court erred in concluding otherwise.

Reversed.

---

[6] We note that that construction of the statute is consistent with the interpretation that DHS, at least at one point, adopted. *See former* OAR 413-120-0640 (Sept 17,1996) (which was in effect when the parties in this case signed the PACA and which provided, "A Post Adoption Communication Agreement is legally enforceable only when it is reviewed by a judge and made a part of the adoption decree per ORS 109.305"). It is also consistent with DHS's emphasis in its administrative rules on the importance of keeping separate the decision to enter into the PACA and the decision to relinquish parental rights. For example, OAR 413-120-0628(3) provides:

"The decision of a birth parent(s) to relinquish parental rights or a Department decision to proceed to a termination of parental rights trial must be made independent from the Department's decision to refer a case for cooperative adoption mediation. One decision must not be conditioned upon the other.

"(a) Relinquishment or termination of parental rights resolves the child's legal status;

"(b) The cooperative adoption mediation process is not a means to avoid a termination of parental rights trial. At no time shall a voluntary relinquishment be conditioned on the willingness of the birth parent(s) and/or adoptive parent(s) to enter into a cooperative adoption mediation process;

"(c) Caseworkers may not guarantee a certain level of openness in adoption nor make any promises regarding the cooperative adoption mediation process to convince a parent(s) to voluntarily relinquish the child for adoption."

*See also* OAR 413-120-0630(3) ("The PACA must not condition the terms of agreement upon the decision of the birth parent(s) to relinquish parental rights.").